IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MARK FIELDS,

                    Plaintiff,

        v.

SHELIA A. VENABLE, et al.,

                    Defendants.

Civil Action
No. 13-7134 (AET-DEA)


**OPINION**


APPEARANCES:

Mark Fields, Plaintiff Pro Se
#544482/S.B.I. 986329B
New Jersey State Prison
PO Box 861
Trenton, New Jersey 08625

RECEIVED

FEB 05 2016

AT 8:30_____M
WILLIAM T. WALSH
CLERK

**THOMPSON, District Judge:**

**I.    INTRODUCTION**

        Before the Court is Plaintiff Mark Fields' ("Plaintiff"),

motion to amend his civil rights complaint filed pursuant to 42

U.S.C. § 1983. (Docket Entry 31). Plaintiff is a state prisoner

currently confined at New Jersey State Prison ("NJSP"), Trenton,

New Jersey. By Order dated May 7, 2015, this Court granted

Plaintiff's application to proceed *in forma pauperis* pursuant to

28 U.S.C. § 1915(a). (Docket Entry 17). Pursuant to Federal Rule

of Civil Procedure 15(a)(1), Plaintiff's motion shall be granted

and the Clerk of the Court shall be directed to file the amended

complaint.

At this time, the Court must review the amended complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief. For the reasons set forth below, the Court concludes that the complaint shall be dismissed for seeking relief from immune defendants and for failure to state a claim. 28 U.S.C. § 1915(e)(2)(B)(ii)-(iii). Plaintiff's miscellaneous motions shall be dismissed as moot.

## II. BACKGROUND

On October 26, 2011, Plaintiff was sentenced by the Honorable Sheila Venable, J.S.C., to a nine-year custodial term with an eighty-five percent parole ineligibility term pursuant to guilty pleas on nine indictments. (Amended Complaint, Docket Entry 31-2 ¶ 36; Docket Entry 19-1 at 1-9). On November 2, 2006, Plaintiff was returned to court where Judge Venable re-sentenced Plaintiff to five years of parole supervision upon his release as she had forgotten to mention that requirement at sentencing.[1] (Amended Complaint ¶ 37).

Latasha Parson, an Institutional Parole Counselor, visited Plaintiff in Northern State Prison to review the terms and

---

[1] The condition was noted on the judgment of conviction, however. (Docket Entry 19-1 at 1).

conditions of parole supervision with him a few days before his release. (Id. ¶ 38). She informed Plaintiff that he would be required to attend Alcoholics Anonymous, receive psychiatric help, enroll in a vocational school, obtain employment, and observe a curfew in addition to the standard conditions of mandatory supervision. (Ibid.; Docket Entry 19-1 at 32.). Included in the standard conditions is Rule #9, requiring parolees "refrain from the use, possession or distribution of a controlled dangerous substance, controlled dangerous substance analog, or imitation controlled dangerous substance" as defined by New Jersey law. (Docket Entry 19-1 at 32).

Plaintiff informed Ms. Parson that he "elected not to participate in the conditions[,]" as he believed the mandatory period of parole supervision to be unconstitutional. (Amended Complaint ¶ 38). He indicated that he "refuse[d] to abide by any of the conditions established in the mandatory parole supervision certificate . . . ." (Ibid.). Ms. Parson presented Plaintiff with a form indicating that he was to refrain from the purchase, possession, and use of alcohol as a special condition of his parole. (Docket Entry 19-1 at 31). Plaintiff refused to sign the form. (Amended Complaint ¶ 38; Docket Entry 19-1 at 31).

Plaintiff began CDS counseling at the Community Resource Center ("CRC") in Jersey City on May 13, 2011. The night before,

3

Plaintiff was in a car accident and was hospitalized at Jersey City Medical Center. (Amended Complaint ¶ 40). His doctor prescribed Ibuprofen and Oxycodone for the pain. (Ibid.). Jenny Ortega, the CRC's Community Solutions Assistant Director, excused Plaintiff from reporting until May 16, 2011. (Id. ¶ 41). She called Officer Cynthia Burczyk, Plaintiff's parole officer, and informed her of Plaintiff's accident and excused absence from CRC. (Ibid.). Defendants Ortega, Vargas, Burczyk, and Vazquez met to discuss Plaintiff's progress on May 19, 2011. (Id. ¶ 42). The CRC employees informed Officer Burczyk that Plaintiff was compliant with the program and that he was given an extension on his reporting until May 23, 2011, due to his injuries. (Ibid.).

Officer Burczyk conducted a home visit on May 20, 2011. (Id. ¶ 43). Plaintiff informed her that he had been in a car accident the previous week when he was being driven home from a strip club. (Id. ¶ 43). He indicated that he was taking pain killers. (Ibid.). Officer Burczyk directed him to report to the CRC on May 24, 2011, and to bring all his medical documentation and the bottles for the medication he was taking. (Ibid.).

On May 23, 2011, the day before he was supposed to report back to the CRC, Plaintiff was in another car accident. (Id. ¶ 44). He went to Jersey City Medical Center for treatment and was discharged the following morning with a swollen thigh and

4

stitches on his forehead. (Ibid.). Officer Burczyk directed him report to the CRC on May 25 and to bring all of his medical documents. (Ibid.).

Plaintiff reported to the CRC as instructed. Ms. Ortega informed Officer Burczyk that Plaintiff was on crutches and expressed concern that Plaintiff could fall. (Id. ¶ 45). She requested that Plaintiff be excused from reporting for one week; Officer Burczyk granted that request. (Ibid.).

Officer Burczyk met with defendants Ortega, Vargas, Vazquez, and Rodriguez on June 2, 2011. (Id. ¶ 48). They indicated to Officer Burczyk that Plaintiff reported earlier that morning and had a doctor's appointment. (Ibid.). They further stated Plaintiff needed to be drug tested the next time he reported to the CRC. (Ibid.). Plaintiff was marked as away without leave ("AWOL") from the CRC on June 4 and 5, 2011. (Docket Entry 19-1 at 45).

On June 9, 2011, Plaintiff tested positive for THC and morphine. (Amended Complaint ¶ 49). He admitted to using Percocet and signed an admission of use form stating that he had been prescribed the drug when he visited Jersey City Medical Center on June 5 for treatment for his injured leg, but denied using heroin or marijuana. (Ibid.). Plaintiff informed Officer Burczyk that he had another doctor's appointment that day and a note excusing him from "work/school" for three days. (Ibid.).

5

Officer Burczyk instructed Plaintiff to report to her office by 4:00 p.m. for a urine test and that if he was still at the doctor's, "he is to leave by 3:45 P.M. to report by 4:00 P.M." and was informed that a warrant may be issued if he failed to report. (Ibid.).

Plaintiff reported to Officer Burczyk at approximately 4:10 p.m. (Id. ¶ 50). He produced paperwork from a pharmacy indicating he had been prescribed Oxycodone by the emergency room doctor. (Ibid.). He also provided prescriptions dated June 8, 2011 that excused him from "work/school" for two weeks. (Ibid.). Urine tests conducted on Plaintiff yielded negative results for THC but a positive result for morphine. (Ibid.). Plaintiff denied using heroin and stated the positive result must be from the prescription medication he took that morning. (Docket Entry 19-1 at 43).

Officers Bellini and Burczyk met to discuss Plaintiff's positive test result while he waited. (Amended Complaint ¶ 51). Officer Burczyk indicated that she wanted to keep Plaintiff at the CRC and would ask him to sign releases in order to get more information regarding his medical conditions and prescriptions. (Docket Entry 19-1 at 43). She would also "closely monitor" Plaintiff's urine tests and test him again the following week as all of the prescription medication should be out of his system at that time. (Amended Complaint ¶ 51). She noted that she would

6

also ask Plaintiff to "contact his doctor to see if he can be prescribed any prescription that is non-narcotic . . . ." (Ibid.). Plaintiff's Chronological Supervision Report states: "[a]ny continued violations will be reviewed with supervision and will result in further sanctions." (Docket Entry 19-1 at 43).

Officer Burczyk spoke with Plaintiff following her meeting with Officer Bellini and "advised him he is to obtain a non-narcotic pain killer." (Amended Complaint ¶ 52). Plaintiff signed a medical release form for the Metropolitan Family Health Network ("MASSH"), but refused to sign release forms for any other doctors. (Ibid.; Docket Entry 19-1 at 43). Plaintiff was excused from reporting to the CRC for two weeks, per the doctor's note, and was directed to bring in any new medications. (Amended Complaint ¶ 52). He was further informed that "if he is in so much pain that he needs a prescribed pain killer, he should be in his residence all day and night." (Ibid.). Plaintiff refused to do so as staying in his residence was not a condition of his supervised release. (Ibid.). Officer Burczyk emailed Ortega, Vargas, Vazquez, and Fair to inform them that Plaintiff had tested positive for morphine and that he had been directed to inquire about a non-narcotic pain killer. (Id. ¶ 53). She also informed them that Plaintiff was excused from reporting until June 24, 2011. (Ibid.).

7

On June 15, 2011, a parole officer went to Plaintiff's approved residence. Plaintiff's sister indicated he "stepped out and she was unaware of his current whereabouts." (Id. ¶ 54). The officer left an "F-10" directing Plaintiff to call Officer Burczyk that day. (Ibid.). Plaintiff called later that afternoon and told her that he had not been home at the time the officer visited because he was out talking a walk. (Id. ¶ 55). When asked how he could walk but not report to the CRC due to leg pain, he told Officer Burczyk that he had been instructed to treat his leg in stages: "(1) stay off leg, keep ice packs on leg and only walk seldomly [sic] on leg in doors [sic] setting no outside"; (2) "keep heating pad on leg no more ice packs therapeutic leg out doors on crutches (Only) as seldomly [sic] as possible . . . ." (Ibid. (emphasis in original)).  He also claimed that he had been excused from CRC as long as he was crutches due to fears that he would fall in the facility. (Ibid.). Officer Burczyk directed him to report on June 17, 2011. (Ibid.).

Plaintiff called the Parole District Office the next day and asked to speak to a supervisor regarding his medical condition. (Id. ¶ 57). Officer Taboada told him that as he was scheduled to report tomorrow, he should bring up his concerns with Officer Burczyk then. (Ibid.). He responded that Officer Burczyk already knew about his conditions. He further claimed he

had not been taking his medications since being told to stop using them. (Ibid.). Plaintiff reported to the office later that day and requested to speak with the "supervisor who decided he is not allowed to take pain killers." (Id. ¶ 58). Officer Taboada asked Plaintiff to produce a urine sample, and Plaintiff responded that "that was totally irrelevant to the purpose of him reporting to the Division of Parole District Office No. 4 today . . . ." (Ibid.). He was then directed to wait in the waiting room. (Ibid.). By 5:00 p.m., however, Plaintiff had left the waiting room without permission and before he had met with his parole officer. (Docket Entry 19-1 at 45).

Plaintiff returned the next day as he had been instructed. Officer Ann Rivers informed him that he is not allowed to take oxycodone, "and if he is in pain, and in need of medication, he is to go to the doctor and to ask for a non-narcotic pain killer." (Id. ¶ 59). He was also instructed that if he could not obtain a non-narcotic pain killer, the doctor had to inform Officer Burczyk. (Ibid.). Plaintiff was also assigned a special condition of a curfew between 8:00 p.m to 8:00 a.m. due to several unreported traffic and municipal ordinance violations and the fact that he was not at home when he was supposed to be on bed rest. (Docket Entry 19-1 at 45-46). He was reminded that he was to report back to the CRC on June 24, 2011. (Amended Complaint ¶ 59).

Officer Burczyk received a notification on June 27, 2011 that Plaintiff did not report to the CRC on June 24 or June 25. (Docket Entry 19-1 at 46). Her report indicates Plaintiff contacted Mr. Vargas at the CRC the day after he was supposed to report and said that he "did not report yesterday (6/24/11) because he lost track of the days and forgot to report." (Docket Entry 19-1 at 46). He was directed to report on June 26. (Ibid.). On June 28, Officer Burczyk contacted the CRC assistant case manager and confirmed Plaintiff had reported on June 26, but not on June 27 or 28. (Id. at 47). Plaintiff was also marked as AWOL on June 29. (Ibid.).

Officer Burczyk contacted Plaintiff to find out why he had failed to report to the CRC on June 29. (Ibid.). He indicated that he was getting blood work done at a clinic in Jersey City and that "he still could have reported to the program this morning since his appointment was not until this afternoon." (Ibid.). He claimed he did not report to the CRC on June 28 because he was in court on a drinking in public ticket. (Ibid.). Plaintiff was reminded to advise the CRC of all his appointments, admonished for his previous AWOLs, and directed to report to the CRC the next day. (Ibid.).

Plaintiff reported to the CRC the next day; however, he was sent home because he was late. (Ibid.). He provided paperwork indicating he had been getting blood work done, at his

daughter's graduation, and in court on his reporting days. (Ibid.). Officer Burczyk admonished Plaintiff and reminded him that he must obtain permission to reschedule before his appointment if he has a conflict with his reporting time. (Ibid.). Plaintiff stated "he has no other doctor appointments scheduled and is not taking any medications." (Ibid.).

He called Officer Burczyk later and asked why his AWOLs were not being excused by CRC. (Id. at 48). She sent an email to Ortega and Vazquez at the CRC asking if Plaintiff had obtained prior approval for missing his reporting dates and provided proof he was where he claimed to be. (Ibid.). She advised them that if he had not, "he cannot be excused and AWOLs remain." (Ibid.). Plaintiff was also recorded as being AWOL from CRC on June 30, July 1, 3, and 5. (Ibid.). On July 5, defendants Burczyk, Ortega, Vargas, and Vazquez spoke regarding Plaintiff's non-compliance with the CRC program. (Ibid.). They agreed Plaintiff would be drug tested the next day. (Ibid.).

When Plaintiff reported to CRC on July 6, he tested positive for morphine and admitted to using Percocet on July 5. (Amended Complaint 31-2 ¶ 60; Docket Entry 19-1 at 48). He claimed he had been at the Jersey City Medical Center emergency room on July 3 due to leg pain. (Amended Complaint ¶ 61). He provided paperwork corroborating his admission and prescription

for Naprosyn,[2] but stated he did not fill that prescription.
(Ibid.). Plaintiff claimed the hospital had given him morphine
in an IV and two Percocet for pain. (Ibid.). He also claimed the
hospital had given him two Percocets to take home for use before
he filled the Naprosyn prescription, but did not provide proof
of this. (Ibid.; Docket Entry 19-1 at 49). He took the two
Percocets on July 4. (Amended Complaint ¶ 61). Officer Burczyk
instructed Plaintiff to come back the next day. (Ibid.).

Plaintiff reported on July 7 for a review and adjustment
session with Defendants Burczyk and Rivers. (Id. ¶ 62). They
reminded Plaintiff that he was not permitted to take narcotic
pain killers and that if he continued to test positive for CDS
or was discharged from the CRC due to non-compliance, he would
be subject to sanctions, including revocation of his supervisory
period. (Ibid.; Docket Entry 19-1 at 49). Plaintiff was
instructed to report to the CRC as soon as he left the parole
office. (Docket Entry 19-1 at 50).

On July 11, Plaintiff called Defendant Burczyk to tell her
that he had sprained his ankle playing basketball on July 9.
(Amended Complaint ¶ 63). He told her that he had a doctor's
note excusing him from reporting for three days. (Ibid.). He
denied that he had been prescribed any medication. (Ibid.).

---

[2] A nonsteroidal anti-inflammatory. *Naprosyn*,
http://www.drugs.com/naprosyn.html (last visited Feb. 4, 2016).

Plaintiff reported to the CRC on July 14 and was instructed to take a urine test. (Id. ¶ 64). He called Officer Burczyk and claimed that he had been told by a supervisor that he would not be drug-tested for two weeks. (Docket Entry 19-1 at 50). Officer Burczyk denied this was the case and directed Plaintiff to submit to a urine test. (Ibid.). He then told her that he might test positive because the hospital gave him a morphine IV and Percocet for his sprained ankle. (Amended Complaint ¶ 64). Ms. Ortega later called Officer Burczyk and confirmed that Plaintiff tested positive for morphine and signed an admission of use form. (Id. ¶ 65). She also indicated that "a few minutes after the test, [Plaintiff] was tipping back in his chair during group and fell off the chair." (Docket Entry 19-1 at 50). An ambulance was called to take him to the emergency room as Plaintiff complained of back pain. (Amended Complaint ¶ 65).

Officers Burczyk and Rivers stayed with Plaintiff while the EMS workers evaluated Plaintiff. Officer Rivers asked Plaintiff to sign a medical release form, but he refused to do so because "he was in too much pain to lift his arm to sign. [Plaintiff] was then seen picking up his pants while on the stretcher." (Docket Entry 19-1 at 50). He was instructed to report to the parole officer as soon as he was discharged, bringing all discharge paperwork and any prescribed medications. (Amended Complaint ¶ 66).

13

Plaintiff called Officer Burczyk on July 15 and told her that his girlfriend had dropped off a note at CRC indicating that he could not report until July 17. (Docket Entry 19-1 at 51). He indicated that he had been prescribed a non-narcotic pain killer but had not filled it yet. (Ibid.). On July 20, Mr. Vazquez emailed Officer Burczyk to inform her that Plaintiff had provided paperwork indicating he is to continue taking Percocet. (Amended Complaint ¶ 67). She responded that Plaintiff was not allowed to take Percocet and that he had been informed several times before that he had to take non-narcotic pain killers. (Docket Entry 19-1 at 51). She further informed Mr. Vazquez that if "[Plaintiff's] doctor says there are no other options besides a narcotic pain killer, [Plaintiff] is to sign as release of information so [Officer Burczyk] can speak with the doctor." (Ibid.). She also inquired about imposing a special condition for a mental health evaluation. (Amended Complaint ¶ 68).

Plaintiff was later reassigned to Officer Jose Salamanca. (Id. ¶ 69). Officer Salamanca reviewed Plaintiff's case history and file, and concluded Plaintiff had to sign a medical release form and receive a mental health evaluation special condition. (Id. ¶ 70). He visited CRC on July 28, where he was informed by Mr. Vasquez that Plaintiff "continues to abuse prescribed medications [and] continues to use medical appointments to fail to attend the program." (Ibid.). Officer Salamanca directed

14

Plaintiff to report to his office on July 29. At their meeting, Plaintiff was instructed to have a mental health evaluation conducted at the Bayonne Behavioral Health Center. (Id. ¶ 72). Plaintiff reported to the health center on August 1 and met with Joe Hawley. (Id. ¶ 73). Mr. Hawley indicated Plaintiff would be placed in an intensive outpatient program and would be referred for an evaluation. (Ibid.).

Ms. Ortega emailed Officer Burczyk on August 2 and informed her that Plaintiff would be administratively discharged from CRC and referred to another program. (Id. ¶ 74). Officer Burczyk requested the discharge report and asked Ms. Ortega to send Plaintiff to the parole office the next time he came to the CRC. (Docket Entry 19-1 at 54). Plaintiff was marked as AWOL from the CRC on July 30 and 31, and August 2. (Docket Entry 19-1 at 54).

Plaintiff's CRC discharge summary indicated that during his reporting period of May 12 to August 2, 2011, he had reported 26 days and had been AWOL 16 days. (Amended Complaint ¶ 75). The report noted Plaintiff had an "excessive" amount of AWOL days and had tested positive for morphine 5 times. (Ibid.). "Plaintiff stated he was taking Percocet for pain, however parole told him that he could not take the medication. [Plaintiff] has an excessive amount of hospital/doctor visits in his short time at the program." (Ibid.).

Officer Burczyk called Plaintiff on August 3 and directed him to report to the district office. (Id. ¶ 76). Plaintiff objected to being called to the office on a non-reporting day, and Officer Burczyk indicated he had to meet his new parole officer. (Ibid.). When he reported, she asked if Plaintiff could provide a urine sample; Plaintiff indicated he could not. (Id. ¶ 77). She asked him again twenty-five minutes later, and Plaintiff stated he still could not. (Id. ¶ 78). She directed Plaintiff to come back to the office at 11:30 a.m. (Ibid.). In the meantime, Officer Burczyk ran a report on Plaintiff and learned he had received two new motor vehicle offenses on July 11 for having an open container of alcohol and driving while his license was suspended or revoked. (Docket Entry 19-1 at 55).

In spite of being directed to return to the parole office at 11:30, Plaintiff did not return until 2:00 p.m. (Amended Complaint ¶ 79). Plaintiff provided a urine sample and tested positive for morphine. (Ibid.). He denied using CDS, but stated he took a Percocet on July 31. (Ibid.). He said that his attorney had instructed him not to speak with parole officers after providing a urine sample. (Ibid.). He also stated his "personal doctor" gave him Percocet on July 29, 2011, and would not prescribe a non-narcotic pain killer. (Ibid.). According to Plaintiff, the doctor refused to speak with parole officers "because they have no authority to tell him what to do and what

16

not to do . . . ." (Ibid.). He initially denied having any new charges, but admitted receiving tickets when confronted with the July 11 charges. (Docket Entry 19-1 at 55). He signed an admission of use form for July 31, 2011. (Amended Complaint ¶ 80).

Officer Burczyk went to Officer Bellini to discuss Plaintiff's case. (Ibid.). She noted Plaintiff's continued use of CDS, despite not having provided any prescriptions for the medications, five admission of use forms, and new traffic and municipal ordinance citations. (Docket Entry 19-1 at 56). Officer Bellini issued an arrest warrant, and Plaintiff was arrested for violating the terms of his supervision. (Amended Complaint ¶ 81). According to the parole officer's log, an empty glassine envelope labeled "lights out" was found in Plaintiff's jacket pocket. (Docket Entry 19-1 at 57). "[Officer] Dehaven asked [Plaintiff] if there was any drugs in the bag. [Plaintiff] stated no and admitted to using heroin prior to reporting." (Ibid.). No other drugs were found. (Ibid.). Plaintiff received notice of a probable cause hearing on August 11, 2011. (Amended Complaint ¶ 86; Docket Entry 19-1 at 68). Plaintiff retained an attorney, and the hearing was scheduled for August 19. (Amended Complaint ¶¶ 87-88; Docket Entry 19-1 at 69).

Officer Carla Shabazz conducted the hearing, and Officer Salamanca represented the Division of Parole. Officer Salamanca

17

indicated the warrant was issued because Plaintiff had tested positive for morphine and had admitted to using narcotic pain killers after being directed to obtain non-narcotic pain medication. (Amended Complaint ¶¶ 89-90; Docket Entry 19-1 at 70). He recommended revocation of Plaintiff's period of supervision. (Docket Entry 19-1 at 72).

Plaintiff's attorney cross-examined Officer Salamanca regarding his claim that Plaintiff had never provided prescriptions, pointing to Officer Burczyk's reports indicating she had received paperwork from Plaintiff on May 25 and June 9, 2011. (Amended Complaint ¶ 98; Docket Entry 19-1 at 72). Counsel further argued there was no provision in the criminal code that criminalized taking a narcotic prescribed by a licensed doctor. (Docket Entry 19-1 at 72). He submitted copies of prescriptions for medication, including generic Percocet that was filled on June 8, 2011. (Ibid.). Plaintiff "offered by way of mitigation that he was in two car accidents and is in excruciating pain." (Ibid.). Officer Salamanca "stated that he had nothing to contest the evidence presented by [Plaintiff's] Attorney." (Amended Complaint ¶ 101; Docket Entry 19-1 at 72).

Officer Shabazz concluded Plaintiff had violated the terms of his supervision by using heroin on May 5, 2011, but that he had not violated the terms by using prescription medication. She noted that there was evidence Plaintiff had provided

18

documentation "to the Parole Officer by way of prescriptions and
doctor's note for pain. Although the Parole Officer and
Supervisor directed subject to discontinue use of Percocet the
medication was prescribed by a doctor for pain related to an
injury." (Docket Entry 19-1 at 73). She further found that
"[t]here does not appear to be any condition on the parole
certificate which precludes [Plaintiff] from taking prescription
medication and therefore is not a violation of supervision."
(Ibid.). She recommended Plaintiff's supervision period be
continued. (Ibid.).

Plaintiff states his attorney was not provided a copy of
the hearing report and contacted the Division of Parole to
inquire as to the report and subsequent notice of decision.
(Amended Complaint ¶ 109). Ella Womack, the Scheduling
Coordinator, informed Plaintiff's counsel that Officer Shabazz
recommend Plaintiff be continued on parole and placed in an
intensive out-patient program, and that the warrant be withdrawn
no later than September 14, 2011. (Id. ¶¶ 110-12). In spite of
that recommendation, Plaintiff was not released from custody.
(Id. ¶ 113).

Parole Board panel members Erdos and Robertson reviewed the
Hearing Officer's report and recommendation, Plaintiff's parole
file, and the electronic recording of the hearing. In a letter
dated September 14, 2011, Craig Schindewolf, the Chief of the

Parole Revocation Unit, informed Plaintiff's attorney that the
panel had decided to remand Plaintiff's case for further
revocation proceedings. (Amended Complaint ¶ 117; Docket Entry
19-1 at 95). The panel specifically requested that "[Officer]
Tischio provide testimony relative to the facts and
circumstances surrounding [Plaintiff's] arrest on August 3, 2011
. . . including, but not limited to [Plaintiff's] alleged
admission to heroin use prior to reporting to the District
Parole Office that day." (Docket Entry 19-1 at 95). Ms. Womack
later wrote to Plaintiff's attorney to inform him that the Final
Revocation Hearing was scheduled for September 30, 2011. (Id. at
96).

Officer Shabazz again conducted the hearing, and Officer
DeHaven testified on behalf of the Division of Parole. (Id. at
98). Officer DeHaven indicated that Officer Tischio was on
family leave, but he had personally participated in Plaintiff's
arrest. (Ibid.). Officer DeHaven stated that he and Officer
Tischio arrested Plaintiff on August 3, 2011, and he "conducted
a search incident to arrest and found a small package in
[Plaintiff's] pocket consistent with normal heroin packaging
with a stamp on it 'lights out.'" He further testified that the
bag was empty, and Plaintiff admitted that he had "already used
what was in the package." (Ibid.). Upon being cross-examined by
Plaintiff's attorney, Officer DeHaven admitted he did not have

20

Plaintiff sign an admission of use form or test the bag for
residue and preserve it as evidence. (Ibid.). He indicated he
did not test or preserve the bag because Plaintiff "was not
charged with a criminal offense so there was no need to log
evidence." (Ibid.).

Plaintiff requested an adjournment to locate the baggie and
admission of use form. (Id. at 98-99). Officer DeHaven objected
to the postponement as he had already admitted neither existed.
(Id. at 99). He argued "that the evidence regarding the baggie
was his conversation with [Plaintiff] about whether [Plaintiff]
had used CDS before coming into the office not any physical
evidence." (Ibid.). He further admitted he had not conducted a
urine test on Plaintiff at the time of Plaintiff's arrest
because Plaintiff had told Officer Burczyk he could not produce
one. (Ibid.). "After [a] lengthy discussion with the Hearing
Officer and his attorney, [Plaintiff] elected to proceed with
the hearing with the evidence (or lack thereof) and testimony
provided by the Division of Parole and decided not to postpone
[the] hearing." (Ibid.). Plaintiff denied using heroin and
admitting to its use. (Ibid.).

In her hearing report, Officer Shabazz recommended that
Plaintiff's term of mandatory supervision be revoked. (Id. at
100). She stated she found Officer DeHaven's testimony to be
credible regarding Plaintiff's admission of use on August 3,

2011. (Ibid.). She further credited Officer DeHaven's explanation "that the baggie was not entered into evidence because [Plaintiff] was not being charged with possession of CDS however the relevant evidence is the conservation following discovery of the baggie not the baggie itself." (Ibid.). She noted that she "would be inclined to recommend the STEPS program to address [Plaintiff's] drug problem, however due to [Plaintiff's] denial of use, contrary to the direct testimony of the Parole Officer and [Plaintiff's] refusal to admit to a drug problem an inpatient program is not a viable option at this time." (Ibid.). Plaintiff submitted written objections to the report, (Id. at 101-03); however on November 3, 2011, the panel consisting of Erdos and Robertson accepted Officer Shabbazz's recommendation and revoked Plaintiff's period of mandatory supervision. (Id. at 104). James Plousis, the Chairman of the Parole Board, denied Plaintiff's administrative appeal on April 18, 2012. (Id. at 110).

Plaintiff filed this complaint on November 22, 2013. On May 7, 2015, this Court granted Plaintiff's application to proceed in forma pauperis, and ordered that summonses would not issue until screening under § 1915 had taken place. (Docket Entry 17). Plaintiff appealed that order on August 28, 2015. (Docket Entry

23).[3] On November 13, 2015, he filed a motion for psychiatric evaluation. (Docket Entry 29). He submitted his amended complaint on November 25, 2015, (Docket Entry 31), and a motion for spoliation sanction on December 7, 2015, (Docket Entry 34).

Plaintiff requests this Court issue a declaratory order that Defendants violated his constitutional rights, award compensatory damages in the amount of $5 million, $5 million in punitive damages, and pain and suffering for injuries in connection with the denial of due process. (Docket Entry 31-2 ¶¶ 149-57).

## III. STANDARD OF REVIEW

### A. Standards for a Sua Sponte Dismissal

Per the Prison Litigation Reform Act, Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996) ("PLRA"), district courts must review complaints in those civil actions in which a prisoner is proceeding *in forma pauperis*, *see* 28 U.S.C. § 1915(e)(2)(B), seeks redress against a governmental employee or entity, *see* 28 U.S.C. § 1915A(b), or brings a claim with respect to prison conditions, *see* 42 U.S.C. § 1997e. The PLRA directs district courts to *sua sponte* dismiss any claim that is frivolous, is malicious, fails to state a claim upon

---

[3] The Third Circuit dismissed Plaintiff's appeal for failure to timely prosecute. *See Fields v. Venable*, No. 15-3115 (3d Cir. Feb. 1, 2016); Docket Entry 35.

which relief may be granted, or seeks monetary relief from a
defendant who is immune from such relief. This action is subject
to *sua sponte* screening for dismissal under 28 U.S.C. §§
1915(e)(2)(b) and 1915A because Plaintiff is a prisoner
proceeding *in forma pauperis* and is seeking redress from a
governmental entity or officer or employee of a governmental
entity.

    According to the Supreme Court's decision in *Ashcroft v.
Iqbal*, "a pleading that offers 'labels or conclusions' or 'a
formulaic recitation of the elements of a cause of action will
not do.'" 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.
v. Twombly*, 550 U.S. 544, 555 (2007)). To survive *sua sponte*
screening for failure to state a claim,[4] the complaint must
allege "sufficient factual matter" to show that the claim is
facially plausible. *Fowler v. UPMS Shadyside*, 578 F.3d 203, 210
(3d Cir. 2009) (citation omitted). "A claim has facial
plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Fair Wind
Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014)

---

[4] "The legal standard for dismissing a complaint for failure to
state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) is the
same as that for dismissing a complaint pursuant to Federal Rule
of Civil Procedure 12(b)(6)." *Schreane v. Seana*, 506 F. App'x
120, 122 (3d Cir. 2012) (citing *Allah v. Seiverling*, 229 F.3d
220, 223 (3d Cir. 2000)).

(quoting *Iqbal*, 556 U.S. at 678). "A complaint that pleads facts 'merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief.' The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678-79).

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (following *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also United States v. Day*, 969 F.2d 39, 42 (3d Cir. 1992). Although *pro se* pleadings are liberally construed, they "still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).

**B. Section 1983 Actions**

A plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of his constitutional rights. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of

> any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress ....

§ 1983. Thus, to state a claim for relief under § 1983, a

plaintiff must allege, first, the violation of a right secured

by the Constitution or laws of the United States and, second,

that the alleged deprivation was committed or caused by a person

acting under color of state law. *See West v. Atkins*, 487 U.S.

42, 48 (1988); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir.

2011).

## IV. ANALYSIS

Since the allegations of the Complaint are disjointed and

unclear, the Court has identified the claims Plaintiff appears

to have intended to raise to the best of its ability.[5] Plaintiff

appears to be raising claims of retaliation, denial of access to

the courts, illegal seizure under the Fourth Amendment, Due

Process violations in the revocation proceedings, malicious

---

[5] For example, the amended complaint contains a claims for relief
section, (Amended Complaint at ¶¶ 149-51), but various
paragraphs contain conclusory allegations that Defendants
violated the Americans with Disabilities Act, Rehabilitation
Act, Contract Clause, and the Equal Protection Clause, (*see,
e.g.,* id. at ¶¶ 81-83). The Court infers that Plaintiff's
omission of certain claims from the claims for relief section
was intentional.

prosecution, cruel and unusual punishment, and failure to train or supervise subordinates.[6] (Amended Complaint ¶¶ 34-35, 149-51).

## A. Immune Defendants

Plaintiff's claims against defendants Venable, Shabazz, Erdos, and Robertson must be dismissed with prejudice as they are absolutely immune from suit.[7]

Plaintiff claims Judge Venable is responsible for all of the alleged harm that befell Plaintiff after she sentenced him. He argues she failed "to protect the plaintiff, from what, in reality, [was] Cruel and Unusual Punishment[,]" and that she had a

> responsibility to protect [Plaintiff] when a sheriff or a marshall [sic] takes a man from a court house and transport[s] him to confinement for Nine (9) years, and non-confinement for Five (5) years. This is her Act. She tolled the bell for him. [sic] and whether she like it or not, she made him her collective responsibility. She is free to do something about him; he is not!

---

[6] The Court notes that Plaintiff also cites violations of his rights to be free from harassment and intimidation and from arbitrary actions of the Parole Board. (Amended Complaint ¶ 34). Mere verbal harassment does not give rise to a constitutional violation. *McKay v. U.S. Dep't of Justice*, 406 F. App'x 570, 570 n.1 (3d Cir. 2010). The Court considers Plaintiff's claim of arbitrary actions of the Parole Board to be part of his Due Process claim.

[7] Parole Board Chairman Plousis is likewise immune for claims arising from his personal participation in the decision to revoke Plaintiff's period of supervision. Plaintiff has alleged other claims against him, however, which shall be dismissed without prejudice as they are currently barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). These claims are discussed below.

(Amended Complaint ¶ 35 at 9). Not only does he fail to state a valid claim against Judge Venable, she is absolutely immune from suit on claims based on her judicial actions. "It is a well-settled principle of law that judges are generally 'immune from a suit for money damages.'" *Figueroa v. Blackburn*, 208 F.3d 435, 440 (3d Cir. 2000) (quoting *Mireles v. Waco*, 502 U.S. at 11, 9 (1991)). "A judge will not be deprived of immunity because the action [she] took was in error, was done maliciously, or was in excess of [her] authority." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978). As a judge of the New Jersey Superior Court, Judge Venable "is absolutely immune from liability for [her] judicial acts even if [her] exercise of authority is flawed by the commission of grave procedural errors." *Id.* at 359. Sentencing is one of the most quintessential judicial acts, therefore Judge Venable is entitled to complete judicial immunity. The complaint against her must be dismissed with prejudice.

Defendants Shabazz, Erdos, and Robertson are entitled to absolute immunity on the claims raised by Plaintiff. The Third Circuit has ruled that "probation and parole officers are entitled to absolute immunity when they are engaged in adjudicatory duties," such as serving as a hearing examiner or making a decision to revoke or deny parole. *Wilson v. Rackmill*, 878 F.2d 772, 775-76 (3d Cir. 1989); *accord Keller v. Pa. Bd. of Prob. & Parole*, 240 F. App'x 477, 480 (3d Cir. 2007).

28

Plaintiff's claims against Officer Shabazz stem from her

participation as the hearing officer during Plaintiff's

revocation proceedings. She is therefore entitled to absolute

immunity under *Wilson*. As members of the Parole Board who were,

according to the amended complaint, ultimately responsible for

the revocation of Plaintiff's supervision term, Erdos and

Robertson are immune as the decision was made in their

adjudicatory capacities.[8] The claims against these defendants are

dismissed with prejudice.

## B. *Heck v. Humphrey*

Plaintiff raises claims of illegal seizure under the Fourth

Amendment, Due Process violations under the Fourteenth

Amendment, malicious prosecution, and cruel and unusual

punishment in connection with the revocation proceedings.

Plaintiff cannot raise these arguments under § 1983 at this time

as he is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) and its

progeny.

In *Heck*, the Supreme Court held that before a § 1983

plaintiff may "recover damages for allegedly unconstitutional

conviction or imprisonment, or for other harm caused by actions

[8] The Court notes that the other parole officers may be entitled
to qualified immunity for actions taken in their executive or
administrative capacities. *Wilson*, 878 F.2d at 775. The Court
makes no findings as to the applicability of qualified immunity
at this time.

whose unlawfulness would render a conviction or sentence invalid," he must first "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" *Id.* at 486-87; *see also Bronowicz v. Allegheny Cty.*, 804 F.3d 338, 346 (3d Cir. 2015) ("'[A] prior criminal case must have been disposed of in a way that indicates the innocence of the accused in order to satisfy the favorable termination element.'" (alteration in original) (quoting *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009))).

The Third Circuit extended *Heck* to suits alleging unlawful revocation of parole because "success on the § 1983 claim would necessarily demonstrate the invalidity of the Parole Board's decision." *Williams v. Consovoy*, 453 F.3d 173, 177 (3d Cir. 2006). If Plaintiff were to succeed on his Fourth Amendment, Due Process, malicious prosecution,[9] and cruel and unusual punishment claims, the validity of the revocation proceedings would be

---

[9] Plaintiff also cannot state a claim of malicious prosecution as one of the necessary elements is a favorable termination of a criminal proceeding. *See Woodyard v. Cnty. of Essex*, 514 F. App'x 177, 182 (3d Cir. 2013)(citing *McKenna v. City of Phila.*, 582 F.3d 447, 461 (3d Cir. 2009)).

called into question.[10] Plaintiff's challenges to the Parole
Board's revocation of his period of supervision and the
procedures it used to arrive at its determination are "not
cognizable under *Heck* unless and until the board's decision has
been invalidated." *Butler v. Pa. Bd. of Prob. & Parole*, 613 F.
App'x 119, 123 (3d Cir. 2015). Plaintiff has not submitted any
facts suggesting it has been,[11] therefore his § 1983 complaint
may not proceed at this time.

As the Fourth Amendment, Due Process, malicious
prosecution, and cruel and unusual punishment claims are barred
by *Heck*, they must be dismissed without prejudice for failure to
state a claim.

## C. Supervisory Liability

Plaintiff asserts defendants Fair, Howley, Ortega, Vargas,
Vazquez, and Rodriguez "had personal involvement in the alleged
constitutional deprivations that they had knowledge of the

---

[10] Indeed, challenging the validity of the arrest and subsequent
revocation proceedings is the primary purpose of the amended
complaint.
[11] The Court notes that Plaintiff is presently challenging the
revocation proceedings in a habeas action pursuant to 28 U.S.C.
§ 2254. *See Fields v. N.J. State Parole Bd.*, No. 13-7693 (D.N.J.
filed Dec. 19, 2013). In the event he is successful in that
challenge, he may file a new complaint raising these claims. *See
Vickers v. Childs*, 530 F. App'x 104, 105 (3d Cir. 2013) ("If a
plaintiff seeks damages attributable to an unconstitutional
conviction or sentence, a § 1983 cause of action does not accrue
until the conviction or sentence has been invalidated or
terminated favorably, whether by direct appeal or some other
means.").

violations and acquiesced, that they created a policy, or custom that resulted in the wrong, and that they were grossly negligent in managing subordinates tolerated past and ongoing misbehavior . . . ." (Amended Complaint ¶ 35). He makes similar arguments regarding defendants Plousis, Schindewolf, and Lanigan. (<u>Ibid.</u>).[12]

State actors are liable only for their own unconstitutional conduct and may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012). A supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates "if they, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[,]" or "if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) (internal citations omitted)(first alteration in original), *rev'd on other grounds sub nom Taylor*

---

[12] Defendants Fair, Howley, Ortega, Vargas, Vazquez, Rodiguez, Plousis, Schindewolf, and Lanigan will be referred to collectively as the Supervisory Defendants.

*v. Barkes*, 135 S. Ct. 2042 (2015). Plaintiff has failed to state a claim under either theory of liability.

Plaintiff does not specify what policy or custom of the CRC and Parole Board led to the alleged constitutional violations. He also has not alleged facts that would suggest the Supervisory Defendants knew of, and were indifferent to, the risk posed by the policy or custom. *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). As failure-to-supervise claims are a subset of policy or practice liability, *Womack v. Moleins*, No. 10-2932, 2015 WL 420161, at *3 (D.N.J. Jan. 30, 2015), Plaintiff has likewise failed to sufficiently plead a failure-to-supervise claim. *See also Barkes*, 766 F.3d at 317 (noting four-part test for failure-to-supervise claims).

To the extent Plaintiff alleges the Supervisory Defendants acquiesced in or directed their subordinates' wrongdoing, he has failed to state a claim. "[A]ny claim that supervisors directed others to violate constitutional rights necessarily includes as an element an actual violation at the hands of subordinates. In addition, a plaintiff must allege a causal connection between the supervisor's direction and that violation, or, in other words, proximate causation." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). As previously noted, Plaintiff has failed to set forth a valid claim for a constitutional

33

violation. Thus, he has not sufficiently pled that the Supervisory Defendants directed their subordinates to violate Plaintiff's constitutional rights, that they knew of their subordinates' actions and acquiesced to their wrongdoing, or that there is a connection between their directions and the subordinates' actions. These claims must be dismissed without prejudice at this time.

## D. Remaining Claims

The remainder of Plaintiff's stated claims,[13] retaliation, access to the courts, and conspiracy, must also be dismissed without prejudice for failure to state a claim.

---

[13] At the end of various paragraphs, Plaintiff makes conclusory allegations that Defendants violated the Americans with Disabilities Act, Rehabilitation Act, Contract Clause, and the Equal Protection Clause. (See, e.g., Amended Complaint ¶¶ 81-83). He also states Defendants failed to provide medical care for his Drug Dependency Disorders. (Id. at 38). These claims are not in Plaintiff's claims for relief, (id. at ¶¶ 149-51), and have no factual support in the complaint. The Court will not address these claims beyond noting that according to the complaint, defendants did attempt to assist Plaintiff with his dependence on narcotics by enrolling him in the CRC. To the extent Plaintiff believes their treatment was inadequate the remedy lies in state tort law, not federal constitutional law. See DeJesus v. Corr. Med. Servs., Inc., 574 F. App'x 66, 68-69 (3d Cir. 2014) ("[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." (internal quotation marks omitted)).

*1. Retaliation*

"[R]etaliation for the exercise of constitutionally protected rights . . . 'is itself a violation of rights secured by the Constitution actionable under section 1983.'" *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (quoting *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990)). Plaintiff must allege "(1) he engaged in constitutionally protected activity; (2) he suffered, at the hands of a state actor, adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action." *Fantone v. Latini*, 780 F.3d 184, 191 (3d Cir. 2015), *as amended* (Mar. 24, 2015).

It is unclear from the face of the complaint as to what activity Plaintiff alleges he was engaged in that was a motivating factor behind defendants' alleged retaliation. As such, this claim must be dismissed.

*2. Access to the Courts*

Plaintiff further claims Defendants violated his right to access the courts under the First and Fourteenth Amendments. *See Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (per curiam) (citing *Lewis v. Casey*, 518 U.S. 343, 354-55 (1996)). "To establish a cognizable claim, a prisoner must demonstrate that he has suffered an actual injury to his ability to present a

claim. A prisoner can show an actual injury only when a nonfrivolous, arguable claim is lost." *Henry v. Moore*, 500 F. App'x 115, 117 (3d Cir. 2012) (citing *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *Lewis*, 518 U.S. at 352-54). Plaintiff has not set forth what claim was lost as the result of Defendants' actions, therefore this claim must be dismissed.

### 3. Conspiracy

Finally, Plaintiff alleges defendants conspired to return him to state prison. (Amended Complaint at 38). "To make out a conspiracy claim under § 1983, [Plaintiff] must show that 'persons acting under color of state law conspired to deprive him of a federally protected right.' As a threshold matter, however, a § 1983 conspiracy claim only arises when there has been an actual deprivation of a right." *Perano v. Twp. of Tilden*, 423 F. App'x 234, 239 (3d Cir. 2011) (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999)). As noted throughout this Opinion, Plaintiff has failed to sufficiently allege any constitutional violations by Defendants. Thus, there cannot have been any agreement to violate any of his rights. The conspiracy claims must be dismissed for failure to state a claim.

### 4. State Law Claims

To the extent the complaint could be construed as raising state law claims, the Court declines to exercise supplemental

jurisdiction as the federal claims are being dismissed. 28 U.S.C. § 1367(c)(3).

## E. Leave to Amend

Generally, "plaintiffs who file complaints subject to dismissal under [§ 1915] should receive leave to amend unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 114 (3d Cir. 2002). Plaintiff may move to amend his complaint by addressing the deficiencies of the claims that have been dismissed without prejudice, with the exception of the claims that are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Any motion to amend the complaint must be accompanied by a proposed second amended complaint.

Plaintiff should note that when a second amended complaint is filed, the amended complaint no longer performs any function in the case and cannot be utilized to cure defects in the first amended complaint, unless the relevant portion is specifically incorporated in the new complaint. 6 Wright, Miller & Kane, *Federal Practice and Procedure* 1476 (2d ed. 1990) (footnotes omitted). The second amended complaint may adopt some or all of the allegations in the amended complaint, but the identification of the particular allegations to be adopted must be clear and explicit. *Id.* To avoid confusion, the safer course is to file a second complaint that is complete in itself. *Id.* The

37

second amended complaint may not adopt or repeat claims that have been dismissed with prejudice by the Court.

**F. Motions**

Plaintiff has also filed a motion requesting a psychiatric evaluation, (Docket Entry 29), and a motion for an order granting a spoliation sanction, (Docket Entry 34). As the complaint is being dismissed, these motions are dismissed as moot.

**V.   CONCLUSION**

For the reasons stated above, Plaintiff's claims against defendants Venable, Shabbazz, Erdos, and Robertson are dismissed with prejudice, as is the claim against Chairman Plousis for denying Plaintiff's administrative appeal. The remainder of the complaint is dismissed without prejudice.

An appropriate order follows.

Feb. 4, 2016
Date

ANNE E. THOMPSON
U.S. District Judge